BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

Attorneys for Plaintiffs Lloyd and Nancy Landman

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LLOYD and NANCY LANDMAN, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>COMERICA BANK,<br><br>                    Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## **NATURE OF THE ACTION**

Plaintiffs Lloyd and Nancy Landman, on behalf of themselves and all others similarly situated, allege as follows against Defendant Comerica Bank ("Defendant" or "Comerica"), based on personal knowledge as to themselves and their own acts, and otherwise based on the investigations conducted by and through their counsel, including review of Defendant's public statements, U.S. Securities and Exchange Commission ("SEC") filings, interviews, media reports, and social media information, as well as other commentary, analysis, and information.

1.     On December 19, 2017, the U.S. Securities and Exchange Commission accused California businessman Robert Shapiro with presiding over a complex web of allegedly phony real estate investments and unregistered funds to deceive more than 8,400 investors, many of them seniors living in retirement communities and on fixed incomes, in a $1.2 billion Ponzi scheme that spanned many years.  The SEC further stated that at least 2,600 of the more than 8,400 impacted investors used their Individual Retirement Account funds to invest nearly $400 million in the scheme and those funds are in jeopardy.

2.     The SEC complaint, unsealed in federal court in Miami, avers that Shapiro, of Sherman Oaks, California, through a group of unregistered investment companies he operated called the Woodbridge Group of Cos. LLC ("Woodbridge" or the "Woodbridge Entities"), sold securities to investors promising 5 percent to 8 percent annual returns, with the payments supposedly coming from interest paid to a Woodbridge affiliate on loans made to third-party borrowers.

3.     According to the SEC complaint, however, there were not nearly enough third-party borrowers to pay off all of the investors Shapiro and his network of sales agents seduced into the scheme.  "Our complaint alleges that Woodbridge's business model was a sham," said Steven Peikin, co-director of the SEC's Enforcement Division. "The only way Woodbridge was able to pay

investors their dividends and interest payments was through the constant infusion of new investor money."

4.    As stated in the SEC's complaint, "[d]espite receiving over $1 billion in investor funds, Shapiro and his companies only generated approximately $13.7 million in interest income from truly unaffiliated third-party borrowers." "Without real revenue to pay the monies due to investors, Shapiro resorted to fraud, using new investor money to pay the returns owed to existing investors."

5.    According to the complaint, beginning in July 2012 through at least December 4, 2017, Shapiro, through his funds, sold investors two primary types of securities: a 12- to 18-month term promissory note bearing 5 to 8 percent interest that Woodbridge described as First Position Commercial Mortgages, and seven different private placement fund offerings with five-year terms.

6.    As reported by the SEC and numerous media outlets, the scheme was revealed and unraveled on or about December 1, 2017, when Shapiro and his companies were unable to pay investors' monthly dividends and interest payments. At that time, Shapiro allegedly halted fundraising from investors, and on December 4, 2017, Woodbridge filed for bankruptcy in Delaware and Shapiro stepped down as chief executive.

7.    According the SEC complaint, Woodbridge had claimed that it would make payments to its promissory note investors (the notes are known as FPCMs based on the acronym "First Position Commercial Mortgage" notes ) via the interest paid to a Woodbridge affiliate on loans generating 11 to 15 percent annual interest supposedly made to third-party commercial property owners. In addition, Woodbridge allegedly told investors it would generate additional revenues by purchasing properties to develop and sell at a profit.

8.    The SEC said that while Woodbridge raised at least $1.22 billion from investors, it issued about $675 million in loans, which generated $13.7 million

from third-party borrowers, "significantly less than required to operate Woodbridge's business and pay returns to investors," the suit alleges.

9.     Despite the shortfall, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments, according to the SEC, then spent another $172 million on operating expenses, as well $21.2 million to support Shapiro's "extravagant lifestyle."

10.     Since there were very few actual third-party borrowers, Shapiro used new investor funds to pay the interest and dividends owed to previous investors. The SEC said those payments "created the illusion that Shapiro and Woodbridge were successfully loaning investor funds as promised to legitimate third-party borrowers who had an ability to pay monthly interest."

11.     That enabled Shapiro to pull new investors into the scheme and convince existing investors to roll over their investment into a new note upon maturity, all of which delayed Shapiro's and Woodbridge's need to come up with cash to repay the principal balance, the SEC said.   "In reality, Woodbridge's business model was a sham — the vast majority of the purported third-party borrowers were hundreds of Shapiro-owned and -controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors," according to the SEC complaint.

12.     Woodbridge, according to the SEC, utilized a network of hundreds of external sales agents to solicit investments from the general public by way of television, radio and newspaper advertisements, cold-calling campaigns, social media, websites, seminars and in-person presentations. The SEC said "virtually none" of these sales agents were registered with any regulatory agency, yet Woodbridge paid them more than $64.5 million in commissions for selling investments in Woodbridge securities.

13.     Shapiro's scheme allowed him to live the high life along with his family.  According to the SEC complaint, Shapiro "lived in the lap of luxury and spent exorbitant amounts of investor money in alarming fashion, on items such as luxury automobiles, jewelry, country club memberships, fine wine and chartering private planes."

14.     Shapiro's malfeasance is further compounded by the fact that he has never been registered with the SEC, the Financial Industry Regulatory Authority, or any state securities regulator, according to the SEC and that he "personally solicited investors, including several high net worth individuals, to invest in Woodbridge."

15.     As is often the case (as seen in the Madoff and feeder fund related litigation), government officials either knew something was awry or suspected wrongdoing before the bottom dropped out leaving investors holding the bag. Reportedly, as confirmed by the SEC's complaint, government officials have been investigating Woodbridge since at least January 2017, when they issued a subpoena seeking company emails written by Shapiro and Woodbridge's controller. In July 2017, the SEC was forced to bring a subpoena enforcement action against Woodbridge after Woodbridge failed to produce the emails.

16.     On October 31, the SEC said it brought a second subpoena enforcement action after Woodbridge failed to produce additional documents sought by subpoenas issued in August seeking information related to the company's ownership structure and payment methods.

17.     Moreover, since 2015, regulators in eight states have filed civil or administrative actions against one or more of the Woodbridge Entities and certain of their sales agents alleging they engaged in the unregistered offering of securities in their respective jurisdictions and have unlawfully acted as unregistered investment advisors or broker-dealers.  Five states, Massachusetts, Texas, Arizona, Pennsylvania, and Michigan, have entered temporary or permanent cease and

desist orders against one or more of the Woodbridge Entities related to their unregistered sale of securities.

18.     Shapiro and the Woodbridge Entities could not engage in this concerted fraud absent the assistance of a sophisticated banking entity such as Defendant Comerica, which served numerous functions.

19.     Comerica was integral to the scheme to defraud investors. Comerica substantially assisted, and had knowledge of, Shapiro's fraud. Comerica therefore is liable to Plaintiff and the other defrauded investors for their losses.

20.     Specifically, Comerica was presented with a myriad "red flags" related to the accounts from which Shapiro misappropriated over $21 million in investor funds. Each bank account was opened and maintained at Comerica. Comerica knew exactly how investor funds went in and out of each account and, as a sophisticated bank, knew or was reckless in not knowing that Shapiro was misappropriating funds or otherwise engaged in fraudulent activity. Further, Comerica continued to enable Shapiro's fraud even after several state regulatory agencies ordered him to cease and desist operations, and Shapiro was the subject of investigations and subpoenas.

21.     Comerica was presented with information indicating Woodbridge lacked internal controls and engaged in many atypical banking activities. Drawing on Woodbridge's Comerica accounts, Shapiro spent millions of dollars on private planes, fancy cars, jewelry, and other luxury goods. Shapiro's wife, and her company, also received substantial investor proceeds from Woodbridge's accounts at Comerica.

22.     Although Woodbridge was purportedly a billion-dollar enterprise, Shapiro remained the sole signatory on all of its accounts and insisted on hand-signing every check to investors and sales agents. Woodbridge and Shapiro used $368 million in new investor funds to pay existing investors out of Comerica accounts. Shapiro pooled investment funds from holders of promissory notes and

of his other fraudulent offerings in fund entity accounts, further commingling those funds into a single Woodbridge operating account under his control. The commingling involved transfers of around $1.66 billion and nearly 11,000 Comerica account transactions. Raising yet another red flag, instead of hiring external auditors, Woodbridge relied on a controller who was not a certified public accountant. Each of these red flags standing alone cried out to Comerica that Shapiro and his web of fraudulent entities was a scheme.

## THE PARTIES

**Plaintiffs**

23.    Plaintiffs Lloyd and Nancy Landman are residents of Clark County, Nevada. They invested $50,000 in FPCM Woodbridge promissory notes and have suffered substantial economic damages as a result of the fraudulent scheme alleged herein, in which Comerica actively participated.

**Defendant**

24.    Defendant Comerica Bank is a Texas banking association with its principal place of business in Dallas, Texas.

25.    Comerica Bank is chartered by the State of Texas and subject to supervision and regulation by the Texas Department of Banking under the Texas Finance Code. Comerica Bank is also a member of the Federal Reserve System under the Federal Reserve Act and thus subject to federal regulations.

26.    All Woodbridge bank accounts were maintained at Comerica.

27.    Comerica Bank is a subsidiary of Comerica Incorporated, which is incorporated under Delaware law and headquartered in Dallas, Texas. According to Comerica Incorporated's Form 10-K filed with the SEC for 2016, "[b]ased on total assets . . . it was among the 25 largest commercial United States financial holding companies."

28.    As Comerica Incorporated acknowledged in its 2016 Form 10-K, it and its subsidiaries are subject to United States anti-money laundering laws and

regulations. Comerica represents on its website that it "and all of its subsidiaries, including Comerica Bank, comply with the Bank Secrecy Act (BSA) and USA PATRIOT Act requirements."

**Relevant Non-Parties**

29.    Robert H. Shapiro is a citizen of Sherman Oaks, California, and also maintains a residence in Aspen, Colorado. Before December 2017, Shapiro served as Woodbridge's CEO, trustee of the RS Protection Trust, and sole operator of most of the entities comprising the Woodbridge Group Enterprise. At all relevant times, Shapiro maintained complete control over the Woodbridge entities and was the sole signatory on Woodbridge's bank accounts at Comerica.

30.    The Woodbridge Group Enterprise operates through a network of affiliated companies that own the various assets comprising its business. All of these companies are directly or indirectly owned by RS Protection Trust.

31.    Woodbridge Group of Companies, LLC is a financial company based in Sherman Oaks that was formed in 2014. It served as the main company through which Shapiro operated the Woodbridge Group Enterprise during the relevant time period. It consisted of approximately 140 employees across six states.

32.    RS Protection Trust is an irrevocable trust settled under Nevada law and controlled by Shapiro. He serves as the trustee, and members of his family are the sole beneficiaries of the trust. RS Protection Trust holds all of Shapiro's business entities and personal assets, including Woodbridge Group Enterprise companies.

33.    WMF Management, LLC is a California LLC controlled by Shapiro. WMF is a holding company for many of the companies comprising the Woodbridge Group Enterprise, all of which Shapiro controlled and operated, which includes Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage

Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC.

34. The Relevant Non-Parties set forth above are not named as defendants in this action. This complaint does not seek to assert any claim or obtain any relief that falls within the exclusive jurisdiction of the pending bankruptcy proceeding or SEC enforcement action. This complaint does not involve any claim subject to the automatic stay of bankruptcy-related claims under 11 U.S.C. § 362(a). Where appropriate, some of the relevant non-parties are collectively referred to "Woodbridge" or the "Woodbridge Entities."

## JURISDICTION AND VENUE

35. This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs and Comerica are citizens of different states, the total amount in controversy exceeds $5 million, excluding interest and costs, and the class contains more than 100 members.

36. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a) based on diversity of citizenship. The amounts in controversy for Plaintiffs' individual claims exceed $75,000, exclusive of interest and costs.

37. The Court has personal jurisdiction over Comerica because it aided and abetted Shapiro's Ponzi scheme and misappropriation of investor funds in California. Shapiro is a resident of Sherman Oaks, California, where Woodbridge is based and has employees. A substantial portion of the residential and commercial properties Woodbridge purchased using investor funds are in Los Angeles, and many of the Comerica bank accounts used to carry out the fraud were opened or experienced account activity originating in the Los Angeles area, including at Comerica's Studio City branch. Comerica maintains more than 95 branches/offices in California and has had a presence in the State for over 25 years.

1    Its market headquarters is in San Jose, and it has a presence throughout the state,

2    including in Los Angeles, the Greater San Francisco area, Orange County, San

3    Diego, Sacramento, and Santa Cruz/Monterey. Comerica engages in purposeful,

4    continuous and systematic banking and business activities in the State, and derives

5    significant revenues therefrom.

6        38.    Venue is proper in this District under 28 U.S.C. § 1391 because

7    Comerica is subject to personal jurisdiction in this District for the claims alleged

8    and a substantial part of the events and omissions giving rise to these claims

9    occurred in this District.

10                              **FACTUAL ALLEGATIONS**

11       39.    Federal law requires banks to know their customers and understand

12   their customers' banking behavior. Under applicable regulations, a bank must

13   maintain procedures that allow it to "form a reasonable belief that it knows the true

14   identity of each customer." 31 C.F.R. § 1020.220(a)(1), (2). Thus, banks are

15   required to collect information about the holder of each account. When an entity

16   opens an account, the bank must obtain information concerning the individuals

17   who control the account.

18       40.    The Financial Industry Regulatory Authority (FINRA) likewise

19   imposes know-your-customer requirements and mandates "reasonable diligence, in

20   regard to the opening and maintenance of every account," including the obligation

21   "to know (and retain) the essential facts concerning every customer and concerning

22   the authority of each person acting on behalf of such customer."

23       41.    Comerica is obligated to comply with the Bank Secrecy Act (BSA),

24   12 C.F.R. § 21.21, including regulations broadening its anti-money laundering

25   provisions.

26       42.    The BSA requires Comerica to develop, administer, and maintain a

27   program to ensure compliance. The program must be approved by the bank's board

28   of directors and noted in the board meeting minutes. It must: (1) provide for a

system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

43.    Comerica also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

44.    Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

45.    Additionally, Comerica must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

46.    The federal government established the Federal Financial Institutions Examination Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual summarizes BSA and anti-money laundering compliance program requirements,

risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual, at p. 5 (2010).

47. Banks must also ensure that their employees follow BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations. Banks are therefore required to train all personnel whose duties may require knowledge of the BSA on that statute's requirements.

48. Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual. These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

49. The FFIEC Manual identifies "lending activities" and "nondeposit account services"—including nondeposit investment products—as services

requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency. Thus, the FFIEC Manual requires heightened due diligence on the part of banks when such services occur, including determining the purpose of the account, ascertaining the source and funds of wealth, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining explanations for account activity.

### A. The Woodbridge Investment Scheme

50.     Woodbridge raised more than $1.22 billion from over 8,400 investors nationwide. At least 2,600 of these investors used their individual retirement account funds to invest nearly $400 million.

51.     Beginning in July 2012 through at least December 4, 2017, Shapiro orchestrated a Ponzi scheme using Woodbridge entities. Woodbridge was the principal operating company of Shapiro's businesses and employed approximately 140 people in offices in six states. Shapiro was the sole owner, and maintained exclusive operational control over, Woodbridge and each of its entities.

52.     Woodbridge raised money by borrowing funds in connection with promissory notes that investors purchased, and through private placement subscription arrangements under which investors purchased units in Woodbridge funds. The promissory notes, referred to in this complaint as FPCMs or FPCM notes—short for First Position Commercial Mortgages—typically had a term of 12-18 months and were marketed as paying a 5%-8% annual return on a monthly basis. Woodbridge's subscription offerings—the "Fund Offerings"—typically had a five-year term, and were marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits. Neither type of investment was ever registered with the SEC or another government agency.

53.     Shapiro's scheme was made possible by Woodbridge's accounts at Comerica as well as an extensive sales operation. Woodbridge employed a sales team of approximately 30 in-house employees. Woodbridge also relied on a network of hundreds of external sales agents to solicit investments from the public through television, radio, and newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations. Virtually none of these sales agents were registered with any regulatory agency.

54.     The purported revenue source enabling Woodbridge to pay returns to investors was the interest a Woodbridge affiliate would be receiving on loans to third-party owners of commercial real estate. Woodbridge represented to investors that its affiliate would pool money from many investors and lend it to a third-party borrower for a short term, and for only about two-thirds of the value of the real estate securing the transaction, thereby ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." According to a Woodbridge FAQ document, "[y]our loan is secured by a hard asset collateral—the property itself." Woodbridge further represented to investors that it conducted all due diligence, including title search and appraisal, on the commercial property and borrower. Woodbridge also represented that after one year, the third-party borrower would be obligated to repay Woodbridge the principal amount of the loan and that upon default Woodbridge could foreclose on the property to recover the full amount owed.

55.     Woodbridge told investors that the third-party borrowers were paying it 11-15% in annual interest for "hard money" loans. The borrowers, Woodbridge told investors, were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing. Woodbridge told FPCM investors that their returns would be derived from those interest payments, falsely promising the investors a pro rata first-position "lien" interest in the underlying properties: "If you have a first position,

that means you have priority over any other liens or claims on a property if the property owner defaults." In the offering memoranda for the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, including in Woodbridge's FPCMs. But in fact, Woodbridge directly applied the incoming funds to pay other investors' returns.

56.    Woodbridge also told investors that it had another revenue source from flipping properties, *i.e.*, buying them to develop and then sell for a profit.

57.    Woodbridge's marketing materials also state that it "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents." That statement was false. Contrary to Woodbridge's representations, almost all of the purported third-party borrowers—the "owner" and "property owner" in parts 2 and 3 of the above marketing graphic—were hundreds of Shapiro-owned and controlled LLCs with no bank account or source of income, and which never made any loan payments to Woodbridge. Shapiro and his sales team concealed these facts from investors while knowing the Woodbridge scheme was unsustainable.

58.    In June 2017, Woodbridge employees engaged in email correspondence regarding a lack of inventory to support investor loans. Woodbridge employee Diana Balayan wrote, "Yikes...that's really bad Dayne. I mean there's no coming back from there." Woodbridge managing director Dayne Roseman replied, "I'm sorry guys. I'm at a loss. I need inventory, now." Responding to Roseman's question as to whether an already encumbered property could be refinanced, Woodbridge employee Lianna Iranossian wrote, "I can't dayne I just can't you are asking the impossible." Roseman replied, "I'm open to suggestions," to which Iranossian responded, "I suggest you kill me lol." Balayan then responded, "Me second."

59.    Shapiro supported Woodbridge's business almost entirely by raising new investor funds and using them to pay returns to existing investors.

Woodbridge raised at least $1.22 billion from FPCM and Fund Offering investors but issued only around $675 million in "loans" for real estate purportedly securing the investments. Instead of generating the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers—far less than required to operate Woodbridge's business and pay returns. Notwithstanding this shortfall, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments. Woodbridge spent another $172 million on operating expenses, including $64.5 million for sales commissions and $44 million for payroll, and $21.2 million to finance Shapiro's lavish lifestyle.

60.    To maintain these Woodbridge operations, Shapiro needed a continuous infusion of new investor funds as well as for existing FPCM investors to roll over their investments at the end of their terms (ideally into longer-term Fund Offerings) so that Woodbridge could avoid repaying the principal.

61.    To generate the large volume of investor funds needed to sustain the Woodbridge operations, Woodbridge aggressively promoted the FPCM notes by offering incentives, such as cash bonuses, to brokers who recommended these investments to their clients. Woodbridge also established a program called "Pass It On" through which brokers were encouraged to inform their colleagues about the FPCM notes. Under that program, a referring broker would earn 25 basis points on each FPCM sale closed by a broker whom he or she referred.

62.    When fundraising eventually slowed, tension emerged between Shapiro and his high-level employees. In May 2016, Shapiro emailed Roseman: "i think you have a bunch of overpaid lazy people up there and i am going to start thining [sic] out the ranks and making people work for a living." Roseman responded that terminating employees would "solve nothing" because the company's main brokers were experiencing the same slowdown in raising additional investor funds.

63.     On December 1, 2017, still owing more than $961 million in principal to investors, Woodbridge missed its first interest payments to investors. On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy.

## B.     The Fraud Emerges

64.     Since 2015, Shapiro and Woodbridge have come under increasing scrutiny and censure by both state and federal regulatory authorities.

### 1.     State Proceedings

65.     Woodbridge and its affiliated entities has been the subject of 25 information requests from state regulators. Five regulators—in Texas, Massachusetts, Arizona, Pennsylvania, and Michigan—have issued cease-and-desist or consent orders based on Woodbridge's securities fraud and sales of unregistered securities. There are pending proceedings against Woodbridge entities in Arizona, Colorado, Idaho, and Michigan.

66.     The terms of these consent decrees and cease-and-desist orders demonstrated that Woodbridge was operating an illegal investment scheme. Public filings in Massachusetts, Texas, Arizona, Pennsylvania, and Michigan exposed Woodbridge's unorthodox and unlawful business practices.

67.     The state regulatory agencies that issued the cease-and-desist and consent orders made them available to the public through their respective websites. Minimal monitoring efforts by Comerica would have turned up numerous, serious regulatory actions against Woodbridge, which should have prompted Comerica to conduct reasonable due diligence in response.

#### a)     Massachusetts

68.     On May 4, 2015, the Massachusetts Securities Division entered into a consent order with Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, and Woodbridge Mortgage Investment Fund 3, LLC.

69.     Massachusetts charged that (1) Woodbridge failed to register the FPCM notes as securities as required by law; (2) Woodbridge did not maintain separate financial accounts for each Massachusetts investor, or a separate fund or pool, for payment of the obligations to each Massachusetts investor, instead paying investors from general corporate accounts; (3) investors relied on Woodbridge to properly value the property serving as collateral on the loan, including its potential for depreciation, to file the Massachusetts investor's security interest on local land records, and to obtain title insurance on the property; (4) and "[i]n cases where the property does not adequately collateralize the loan made by Woodbridge, Massachusetts Investors will have to rely on Woodbridge to maintain liquid cash reserves to continue making interest and principal payments despite possible loss in the value of collateral."

70.     By operation of the Massachusetts consent order, Woodbridge was to cease and desist selling unregistered securities in the state, was censured by the Massachusetts Securities Division, rescinded the FPCM agreements with Massachusetts investors and returned their principal investments, and agreed to pay the Commonwealth of Massachusetts a $250,000 civil penalty.

### b)     Texas

71.     On July 17, 2015, the Texas State Securities Board issued an emergency cease-and-desist order against Shapiro and Woodbridge Mortgage Investment Fund 3, LLC, among other entities.

72.     Texas entered the following findings of fact: (1) Shapiro controlled Woodbridge; (2) the FPCM notes were not registered for sale as securities in Texas; (3) the brokers selling the FPCM notes in Texas were not registered; (4) Woodbridge and Shapiro did not take reasonable steps to verify that all of its purchasers were accredited investors; (5) Woodbridge and Shapiro failed to disclose Woodbridge's assets, liabilities, and other financial data relevant to Woodbridge's ability to pay investor returns and ultimately principal; (6)

Woodbridge failed to disclose how investor funds would be held while Woodbridge attempted to raise sufficient money to fund the commercial loans; (7) Woodbridge failed to disclose the risks associated with the FPCM notes; and (8) Woodbridge failed to disclose that it had entered into a consent order with the Massachusetts Securities Division.

73.     Texas concluded that Woodbridge and Shapiro violated state law by offering unregistered securities for sale and committing fraud in connection with the offer for sale of securities. The Texas State Securities Board accordingly ordered Woodbridge and Shapiro to stop selling the FPCM notes in Texas and to stop committing fraud in connection with the sale of the FPCM notes in Texas.

74.     Shortly after its issuance, the Texas cease-and-desist order was reported in the legal press.[1]

### c)     Arizona

75.     On October 4, 2016, the Securities Division of the Arizona Corporation Commission instituted cease-and-desist proceedings against Shapiro and several Woodbridge affiliates.

76.     Arizona charged that: (1) Shapiro controlled the Woodbridge funds; (2) if the real estate did not adequately capitalize the loans, the Woodbridge funds might not have enough liquid cash reserve to continue making investor payments; (3) investor security interests might be invalidated by the Woodbridge funds' failure to perfect the security interests; (4) the Woodbridge funds sold the FPCM notes through unregistered sales agents; (5) Woodbridge falsely told investors that "Woodbridge and its predecessors have never been found to have violated any securities law"; (6) Woodbridge sold unregistered securities in the state of Arizona,

---

[1]     Jess Krochtengel, *Texas Regulator Calls Out 3 Businesses For Securities Fraud*, LAW360 (July 22, 2015), https://www.law360.com/articles/682361?utm_source=rss&utm_medium=rss&utm_campaign=articles search.

using unregistered sales agents, both in violation of Arizona law; and (7) Woodbridge committed securities fraud by failing to disclose the Massachusetts and Texas consent decrees.

### d)   Pennsylvania

77.   On April 24, 2017, the Commonwealth of Pennsylvania Department of Banking and Securities issued an order concluding that Woodbridge violated the Pennsylvania Securities Act of 1972 by offering securities through unregistered sales agents.

78.   Instead of defending itself in litigation, Woodbridge entered into a consent decree with Pennsylvania regulators under which it was required to pay a $30,000 fine.

### e)   Michigan

79.   On August 8, 2017, Michigan's Department of Licensing and Regulatory Affairs issued a cease-and-desist order prohibiting Woodbridge from offering or selling unregistered securities in the state or omitting material facts in connection with the sale of securities.

80.   Following its investigation, Michigan found: (1) the FPCM notes were unregistered securities; and (2) Woodbridge described the FPCM notes as safe and low risk, but did not provide financial information to demonstrate its ability to pay promised returns or disclose to investors that it was the subject of several cease-and-desist orders.

81.   Michigan ordered Woodbridge to cease and desist selling unregistered securities in the state, and imposed a civil fine of $500,000.

### 2.   Federal Proceedings

82.   The SEC has been investigating Shapiro and Woodbridge since at least September 2016. The SEC's investigation has focused on Woodbridge's unregistered sale of securities and whether it "is operating a fraud on its investors."

a)   **The SEC's Subpoena Enforcement Actions**

83.   Woodbridge has refused to cooperate with the SEC investigation. The SEC consequently brought two separate enforcement actions, one of which resulted in a motion for civil contempt.

84.   Shapiro and his high-level employees—managing director Roseman and controller Pedersen—refused to answer any questions at their SEC depositions, instead invoking their rights against self-incrimination under the Fifth Amendment.

85.   Woodbridge's intransigence did not prevent the SEC from discovering its fraud. In one of the subpoena enforcement proceedings, the SEC stated, "Woodbridge has represented to investors that bona-fide third parties are borrowing money and repaying interest at a high rate, of which the investors in Woodbridge funds get a portion thereof. However, evidence obtained in our investigation reveals that many, if not all, of these LLCs may be Woodbridge affiliates with Shapiro as their Manager."

b)   **Woodbridge's Bankruptcy**

86.   On December 4, 2017, Woodbridge declared bankruptcy under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Woodbridge has attempted to use this voluntary bankruptcy proceeding to procure a stay of the SEC subpoena enforcement actions.

87.   Woodbridge alleged in the bankruptcy proceeding that it is now transitioning to an institutional fundraising model, and that it has removed Shapiro from control over the entities and replaced him with an independent manager. Nonetheless, Woodbridge agreed to retain Shapiro as a consultant, pay him $175,000 per month, allow him to continue to use multi-million dollar Woodbridge-owned properties in Los Angeles and Aspen at below-market rents, and give him the authority to remove the supposedly independent manager.

88.   Moreover, in the bankruptcy proceeding, Woodbridge for the first time asserted the position that the FPCM noteholders, who comprise the vast

majority of the creditors, with $750 million of debt outstanding, are in fact unsecured and should lose their entire investment. A footnote in the declaration of the newly appointed independent manager states:

It appears that few, if any, Noteholders have taken proper steps to perfect their interest in the Notes pursuant to either of sections 9-312(a) or 9-313(a) of the Uniform Commercial Code ("UCC"), which provide that a security interest in promissory notes (such as the collateral securing the Notes) must be perfected by taking possession of the underlying notes or by the filing of a UCC-1 financing statement describing the underlying notes, respectively. The Debtors have confirmed that no Noteholder is in possession of any of the collateral securing the Notes. Further, on information and belief and based on an investigation, no Noteholder has filed a UCC-1 financing statement with respect to any of the collateral securing the Notes in Delaware, the jurisdiction of the Funds. It therefore appears that any security interests held by the Noteholders is avoidable, such that the Noteholders' claims will ultimately be treated as unsecured claims in these Chapter 11 Cases. The Debtors intend to commence adversary proceedings seeking the avoidance of these security interests.[2]

89.     Woodbridge's position in the foregoing respect contradicts its promises to the FPCM noteholders in its offering and promotional materials. Those materials make no mention of any need on the part of investors to "perfect" their security interests, but state unequivocally:

- •     "Secured by commercial real estate;"
- •     "Recorded first lien position;"

---

[2]     Declaration of Lawrence R. Perkins, *In re Woodbridge Group of Companies, LLC* (Bankr. D. Del. Dec. 4, 2017), ECF No. 12 at 8 n.9.

- "Woodbridge hereby grants to the Lender a security interest in all of the Woodbridge's [sic] present and future right, title and interest in and to any and all of [the collateral];" and

- "This note will be secured inter alia by the Collateral Assignment Documents upon execution thereof."

### c) The SEC's Civil Enforcement Action

90. On December 20, 2017, the SEC filed a civil complaint for injunctive and other relief charging that Shapiro ran a "massive Ponzi scheme," commingled investor funds, paid existing investors with money garnered from new investors, and misappropriated millions of dollars to "live[] in the lap of luxury . . . spen[ding] exorbitant amounts of investor money in alarming fashion, on items such as luxury automobiles, jewelry, country club memberships, fine wine, and chartering private planes."[3]

91. According to the SEC, "Woodbridge's business model was a sham"— instead of paying investor returns with interest obtained from legitimate third-party mortgages, Woodbridge and Shapiro aggressively raised funds from new investors and used those incoming funds to pay old investor returns.

92. The court acted immediately on the SEC's emergency ex parte motion for a temporary asset freeze and a sworn accounting of all Woodbridge accounts, granting the motion on December 20, 2017, setting a hearing for December 29, 2017, and "find[ing] good cause to believe that unless immediately restrained and enjoined . . . Defendants Shapiro, RS Trust, Non-Filer Shapiro Property LLCs and Non-Filer Shapiro Holding LLCs, will continue to dissipate, conceal or transfer . . . assets that are likely subject to an Order of disgorgement."

93. The SEC does not seek restitution for the investors who face a substantial risk of losing their investments.

---

[3]     *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla. filed Dec. 20, 2017).

### C.    Comerica Abetted and Participated in the Woodbridge Fraud

94.    Shapiro's banking activities at Comerica were integral to his scheme to bilk investors in California and across the country. It was through Comerica account transactions that Shapiro applied new investor funds to pay existing investor returns, disbursed investor funds to his wife and her company, and spent millions in investor funds for his own personal enjoyment.

95.    Shapiro could not have carried out his scheme without first raising a tremendous amount of investor funds, and then depositing and transferring those funds among bank accounts to conceal that Woodbridge was raising more money than the underlying properties and pledged collateral could support. Shapiro's use of Comerica accounts to shuffle money through a tangle of affiliated entities enabled him to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments with interest earned from bona fide third-party mortgages.

96.    Shapiro could not have carried out his scheme without either: (A) using a complex array of accounts at different banks, so that no single bank would be able to detect the ongoing fraud; or (B) getting a single bank—here, Comerica—to turn a blind eye to his unorthodox asset transfers, sales of unregistered securities (through unlicensed brokers), commingling of investor funds, and other highly irregular banking activities.

97.    Under applicable banking regulations, Comerica was required to "know its customers"—Shapiro and Woodbridge—and maintain a customer due diligence program to predict the types and volume of transactions Shapiro and Woodbridge were likely to conduct so Comerica could identify any suspicious activity.  Yet Comerica continued to provide Shapiro with the banking support and account platforms needed to carry out his scheme to defraud even after state and federal proceedings brought Woodbridge's violations to light.

98.    News of the state regulators' actions against Woodbridge could be found through internet searches. The cease-and-desist and consent orders against Woodbridge caused some Woodbridge investors to demand refunds, placing further pressure on Woodbridge's business. Its misconduct was all the more visible to the bank that maintained the accounts being used to carry out the fraud.

99.    Even before the state and federal regulatory proceedings commenced, Shapiro's Comerica banking activities provided several indicia of his misconduct. Many of Shapiro's atypical banking activities constituted FFIEC red flags—visible to Comerica but not to individual investors.

100.    By way of example, Shapiro pooled investor funds in fund entity accounts and commingled them further into a single Woodbridge operating account under his control. His commingling of assets involved around $1.66 billion in transfers and nearly 11,000 Comerica account transactions. The unusual nature and high volume of this account activity gave the bank notice of the illegitimacy of this real-estate investment business, and should have caused Comerica to take responsive measures.

101.    Shapiro applied $368 million in new investor funds to pay existing investors out of Comerica accounts.

102.    Shapiro also applied investor funds in Comerica accounts to purchase almost 200 properties in the Los Angeles and Aspen areas for around $675 million. The net returns from those properties have been nominal, with many remaining undeveloped, vacant lots. On January 26, 2017, Shapiro emailed Woodbridge managing director Dayne Roseman that "the numbers this month look awful due to lack of inventory," suggesting that Woodbridge "take money in with property pending." Roseman agreed to do so. Comerica ignored Woodbridge's "awful" financial numbers and the fact that its intake of investor funds was not matched by corresponding real-estate development or lending to genuine counterparties.

103.   Although Woodbridge raised at least $1.22 billion from investors, most of which was allegedly secured by third-party mortgage loans, it issued only $675 million in such loans. And, instead of generating the substantial interest promised to investors, the loans generated only around $13.7 million from bona fide third-party borrowers— much less than required to operate Woodbridge's business and pay returns to the investors.

104.   Comerica processed the incoming interest payments and therefore knew that only third-party borrowers were making interest payments to Woodbridge—none of the Shapiro-affiliated entities that had received loans was paying any interest. Further, Comerica knew that the interest payments to Woodbridge it was processing did not come close to matching Woodbridge's committed outlays and purported business operations.

105.   A forensic accountant retained by the SEC examined Woodbridge's bank account records and concluded that the transactional activity in Woodbridge's Comerica accounts was not consistent with its purported business model.[4]

106.   In particular, the forensic analysis showed that as early as the third quarter of 2012, and continuing through September 2017, Woodbridge did not generate sufficient income and continuously ran at a cash-flow deficit, which by September 2017 had ballooned to $250 million.[5] Comerica was aware of Woodbridge's long-term lack of profitability, and, as depository for all of Woodbridge's revenues, Comerica saw that Woodbridge's real-estate business had no meaningful source of incoming cash apart from investor funds. Woodbridge's ongoing unprofitability, coupled with the banking activity described above, which Comerica observed, constituted a red flag.

---

[4]     Declaration of Soneet R. Kapila, ¶¶ 76-78, *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla.), ECF No. 36-2.

[5]     *Id.,* ¶¶ 86-88.

- 25 -

107.   The forensic investigation that concluded that the "Woodbridge Entities conducted transactions in a manner consistent with the attributes of a Ponzi scheme" was conducted via a "Bank Reconstruction" which "Comerica Bank records are the source documents for the Bank Reconstruction." *Id.,* ¶¶ 60, 84-97.

108.   Additionally, although Woodbridge was a billion-dollar enterprise, Shapiro was the sole signatory for all Woodbridge bank accounts. And he insisted on hand-signing each and every check, whether to investors, sales agents, or others. These arrangements were highly unusual. An investment concern of Woodbridge's size normally employs a management structure with multiple executives and account signatories.

109.   Shapiro disbursed investor monies out of Woodbridge's Comerica accounts for such suspicious expenditures as $1.4 million on luxury retail purchases at stores like Chanel and Louis Vuitton, $1.6 million on home furnishings, $1.2 million in alimony to his ex-wife, $340,000 on luxury cars, and $400,000 on jewelry.

110.   Shapiro's self-dealing extended to his family as well. His wife and her company Schwartz Media received substantial investor proceeds from Woodbridge's Comerica accounts.

111.   Woodbridge's bookkeeping system also was at odds with its large-scale fundraising activities. Instead of retaining external auditors, Woodbridge relied on a controller in a satellite office who was not even a certified public accountant.

112.   In spite of these signs of an illicit enterprise and the mounting orders against Woodbridge, Comerica failed to report the fraudulent conduct or otherwise respond to the red flags connected with the Woodbridge accounts. It continued to accept deposits of Woodbridge investor money, carrying out the transfers needed to consummate the fraud.

113.   At all relevant times, Defendant and each Relevant Non-Party was a principal, agent, alter ego, joint venture, partner, or affiliate of Defendant and each of the other Relevant Non-Parties, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Defendant and each Relevant Non-Party had actual knowledge of the wrongful acts of Defendant and each of the other Relevant Non-Parties, ratified, and retained the benefits of those wrongful acts.

114.   Defendant and each Relevant Non-Party aided and abetted, encouraged, and rendered substantial assistance to Defendant and each of the other Relevant Non-Parties in perpetrating their fraudulent scheme on Plaintiffs and the class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, Defendant and each Relevant Non-Party acted with an awareness of its primary wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

115.   Comerica, aware of the illegal Woodbridge scheme and its injurious effects, fraudulently concealed the scheme by failing to report it while continuing to execute the account transactions that were its lifeblood.

116.   Comerica, Woodbridge, and Shapiro fraudulently concealed from Plaintiffs and class members that the overwhelming majority of FPCMs and Fund Offerings were not secured by loans to holders of commercial real estate, that returns on FPCMs and Fund Offerings would be paid from similar investments, and only on condition that those future transactions occur, rather than from interest payments on the sham third-party loans described in the offering materials, that Shapiro was embezzling millions of dollars in investor funds for his own personal use and enjoyment, that Woodbridge and Shapiro had unlawfully failed to register the FPCMs and Fund Offerings with government regulators, and that Woodbridge

1  and Shapiro had entered into several consent decrees with governmental regulators
2  requiring them to stop violating the law.

3          117.   Comerica, Woodbridge, and Shapiro were aware that Plaintiffs and
4  class members did not know about the Woodbridge investment fraud. Comerica,
5  Woodbridge, and Shapiro had superior and exclusive knowledge of that fraud.
6  Despite reasonable diligence on their part, Plaintiffs and class members were kept
7  ignorant by Comerica, Woodbridge, and Shapiro of the factual bases for these
8  claims for relief.

9          118.   The   FPCM   and   Fund   Offering   sales   materials   contained
10 misstatements designed to entice Plaintiffs and class members to purchase "safe"
11 and "secured" investments with returns generated by third-party borrowers'
12 interest payments. These fraudulent misrepresentations had the effect of concealing
13 that Woodbridge was, in fact, using primarily new investor funds to fund existing
14 investors' returns.

15         119.   Plaintiffs and class members reasonably relied to their detriment on
16 Comerica, Woodbridge, and Shapiro's fraudulent concealment of their violations.
17 As a result of this concealment, Plaintiffs and class members did not believe that it
18 was necessary to file a lawsuit.

19         120.   Plaintiffs and class members did not discover, and exercising
20 reasonable diligence could not have discovered, the facts establishing Comerica's
21 violations or the harm caused thereby until the Woodbridge entities declared
22 bankruptcy and the SEC filed its enforcement action in December 2017. Plaintiffs
23 learned of the relevant actions of Comerica, Woodbridge, and Shapiro through the
24 bankruptcy and SEC actions and their coverage in the press. Only then did
25 Plaintiffs retain counsel to vindicate their rights. Because Plaintiffs could not have
26 reasonably discovered the facts constituting Comerica's violations until December
27 2017, all applicable statutes of limitation were tolled until then.

28

**CLASS ACTION ALLEGATIONS**

121.   Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who invested in Woodbridge FPCM promissory notes or Woodbridge units.

122.   Excluded from the class are Defendant, its parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and the Relevant Non-Parties listed above.

123.   Numerosity. The class members are too numerous to be practicably joined. The class members are identifiable from information and records in the possession, custody, or control of Defendant or the Relevant Non-Parties. Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

124.   Typicality. Plaintiffs' claims are typical of the claims of other members of the class. Plaintiffs and each class member invested in Woodbridge investments at issue and were subject to the wrongful conduct alleged in this complaint.

125.   Adequacy of Representation. Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of the other class members.

126.   Plaintiffs' counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

127.   Commonality and Predominance. Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. Among the questions common to the class are:

a.      Whether Shapiro and Woodbridge committed fraud and/or breached duties to Plaintiffs and members of the class;

b.      Whether Comerica aided and abetted, joined, and/or participated in Shapiro's and Woodbridge's fraud and/or breach of duties;

c.      Whether Comerica knowingly disregarded atypical banking activity and other red flags that Shapiro and Woodbridge were committing investor fraud, breaching fiduciary duties, and/or misappropriating investor funds;

d.      Whether Comerica's continued banking support for Shapiro and Woodbridge's violations, to the detriment of Plaintiffs and members of the class, constitutes negligence;

128.   Superiority. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although each class member paid at least thousands of dollars to invest in the relevant Woodbridge investments, the cost of litigation will be high. The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions. Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.

129.   Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

## **FIRST CLAIM FOR RELIEF**
### **Aiding and Abetting Fraud**

130.   Plaintiffs incorporate the foregoing allegations by reference.

131.   As set forth more fully above, Shapiro and Woodbridge perpetrated fraud on the investing public through a series of materially false and misleading statements and omissions. Among other fraudulent conduct, Shapiro and

Woodbridge (i) misrepresented the security of the FPCM and Fund Offering investments; (ii) represented that these investments would fund loans to bona fide third parties, when the vast majority of the purported third-party borrowers were LLCs owned and controlled by Shapiro that lacked an income source and never made loan payments; (iii) failed to disclose to investors that they issued only $675 million of the $1.22 billion raised in loans; (iv) concealed from investors that they were operating a Ponzi scheme by, among other unlawful acts, commingling investor funds and paying earlier investors with funds obtained from later investors; and (v) concealed from investors that Shapiro misappropriated and misused millions of investor funds for improper purposes, like financing personal luxuries.

132.   Plaintiffs and class members reasonably relied to their detriment upon Shapiro and Woodbridge's fraud when they purchased the relevant securities.

133.   Comerica knowingly and substantially assisted Shapiro and Woodbridge in unlawfully defrauding Plaintiffs and the class, in at least the following respects:

a.   Accepting for deposit funds derived from the sale of unregistered securities;

b.   Commingling investments from Woodbridge promissory note holders and purchasers of fund offering units;

c.   Executing and condoning atypical banking procedures to service Shapiro's complex series of accounts, such as accommodating Shapiro's insistence that he hand-sign every check to investors and sales agents;

d.   Carrying out improper and atypical financial transactions such as the transfer of approximately $1.66 billion via nearly 11,000 account transactions;

e.   Continuing to service Woodbridge accounts after five state regulatory agencies determined that Shapiro was engaged in unlawful conduct and served him with cease-and-desist or consent orders;

f.      Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

g.      Failing to implement and adhere to compliance and monitoring protocols concerning the use of Plaintiffs and class members' investment funds;

h.      Failing to identify, monitor, or exercise required due diligence in relation to the existence or nonexistence of bona fide third-party borrowers; and

i.      Failing to prevent, report, or otherwise take corrective action in response to Shapiro's misappropriation and misuse of investor funds.

134.   In connection with providing substantial and material assistance to Shapiro and Woodbridge, Comerica was aware of its role in the Woodbridge Ponzi scheme and acted knowingly in assisting Shapiro and Woodbridge.

135.   Comerica substantially benefited from its participation in the Woodbridge Ponzi scheme. The scheme caused Comerica to earn income from fees and from investing capital derived from Woodbridge investors.

136.   As a direct and proximate result of Comerica's aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty

137.   Plaintiffs incorporate the foregoing allegations by reference.

138.   At all relevant times, Shapiro was the CEO of Woodbridge and the trustee of the RS Protection Trust.

139.   At all relevant times, Shapiro maintained complete or substantially complete control over the Woodbridge Group of Companies and each of the Woodbridge investment funds. Shapiro had complete control, and was the sole signatory for, the Comerica bank accounts in which investor funds were deposited. Shapiro also wrote investors personally, characterizing collateral as "senior" and promising them satisfactory returns.

140.   By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, Shapiro owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith. By selling Plaintiffs and class members promissory notes and fund offerings pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, Shapiro breached fiduciary duties he owed to Plaintiffs and class members.

141.   Comerica substantially assisted in Shapiro's breaches of fiduciary duty with knowledge that Shapiro was breaching those duties.

142.   As a direct and proximate result of Comerica's aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

### Negligence

143.   Plaintiffs incorporate the foregoing allegations by reference.

144.   Shapiro and Woodbridge deposited customer funds from Plaintiffs and class members into Comerica bank accounts.

145.   Comerica knew or should have known that funds raised from Woodbridge investors constituted investor funds. Comerica knew or should have known that it was subject to various common law and regulatory requirements related to monitoring accounts at Comerica, including regulations issued to prevent money laundering and other illicit behavior.

146.   Comerica owed a duty to Plaintiffs and class members to take reasonable care with regard to the maintenance and use of investor funds on deposit at Comerica. As set forth more fully above, Comerica breached this duty of care by, among other things:

a.      Failing to employ reasonable care in connection with the maintenance and use of Woodbridge investor funds;

b.      Failing to identify, monitor, or exercise requisite due diligence related to the discrepancies and inconsistencies that characterized Shapiro and Woodbridge's deposits and outlays of investor funds;

c.      Failing to implement and adhere to compliance and monitoring protocols concerning Shapiro and Woodbridge's maintenance and use of investor funds;

d.      Failing to identify, monitor, or exercise requisite due diligence related to the regulatory and compliance "red flags" detailed herein, including after the issuance and publication of several state cease-and-desist and consent orders;

e.      Failing to prevent or take any appropriate action in response to Shapiro and Woodbridge's use of funds from new investors to pay sums owed to earlier investors;

f.      Failing to prevent or take any appropriate action in response to Shapiro's embezzlement of investor funds for personal luxuries;

g.      Causing and allowing investor funds to be misappropriated and misused; and

h.      Failing to notify investors or any governmental entity or regulator of Shapiro and Woodbridge's misappropriation and misuse of investor funds.

147.   The breaches described above constitute negligence amounting to bad faith.

148.   Comerica's negligence caused reasonably foreseeable harm to Plaintiffs and class members.

149.   The policy of preventing future harm strongly disfavors application of the economic loss rule, particularly given the moral blame attached to abetting investment fraud. Plaintiffs and class members did not enter into contracts with Comerica and, thus, seek recovery in tort. There is a high degree of certainty that Plaintiffs and class members suffered injuries, and those injuries were highly

foreseeable to Comerica. The transactions associated with Woodbridge's Comerica accounts were intended to, and did, directly affect the investors who had been promised returns and delivery of principal.

150.   As a direct and proximate result of Comerica's negligence, Plaintiffs and class members have lost all or most of the money they paid to Shapiro and Woodbridge, have been denied the use of their assets since making those investments, and have been damaged thereby in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A.   Certifying this action for class treatment, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.   Awarding damages or restitution, including pre-judgment interest, on each Count in an amount to be determined at trial;

C.   Awarding reasonable attorneys' fees and costs of litigation; and,

D.   Granting such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any counts for which a trial by jury is permitted by law.

Respectfully submitted,

Dated: January 18, 2018

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By:   ___*/s/ Betsy C. Manifold*___
        BETSY C. MANIFOLD

BETSY C. MANIFOLD
RACHELE R. RICKERT
MARISA C. LIVESAY
BRITTANY N. DEJONG
750 B Street, Suite 2770

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

San Diego, CA 92101
Telephone:   619/239-4599
Facsimile:    619/234-4599
manifold@whafh.com
rickert@whafh.com
livesay@whafh.com
dejong@whafh.com

**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLP**
GREGORY M. NESPOLE
DEMET BASAR
MATTHEW M. GUINEY
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
gmn@whafh.com
basar@whafh.com
guiney@whafh.com

WOODBRIDGE:24385